# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOE BURGOS VEGA,     :
    Plaintiff,     :
            :
    v.       :   Case No. 3:03-cv-2248 (PCD)
            :
THERESA LANTZ, et al.,    :
    Defendants.    :

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case involves the rights of a state prisoner who has been classified as a sex offender by the Connecticut Department of Correction (DOC) despite never having been convicted of a sex offense. The Plaintiff, Joe Burgos Vega, who is presently incarcerated for his conviction of several violent crimes but who was acquitted of a sexual assault charge at trial, brings this civil rights action against Defendants Commissioner of Correction Theresa Lantz, former Deputy Commissioner Jack Tokarz, and Director of Inmate Classification and Population Management Fred Levesque, claiming that he was improperly classified as a sex offender by the DOC in violation of his rights under the Eighth and Fourteenth Amendments. Plaintiff has moved for summary judgment on his due process claim, and Defendants have filed a cross-motion for summary judgment on all of Plaintiff's claims. The Court holds that a prisoner does have a protected liberty interest in not being classified as a sex offender based on non-conviction information without adequate due process; and, while an inmate does not have the right to dictate an administrative decision about his incarceration, he does have the right to challenge an administrative decision which has an adverse effect on him and which is outside the normal course of hardships endured by prisoners. Accordingly, for the reasons stated below, both Plaintiff's and Defendants' cross-motions for summary judgment [Doc. Nos. 86, 95] are **granted**

**in part** and **denied in part.**

I.     **BACKGROUND**

    A.     <u>**DOC Classifications**</u>

       This lawsuit challenges the DOC's classification procedures for its inmates insofar as they involve a sex offender classification.  Every inmate in Connecticut is assigned an Overall Risk Level, a classification that dictates to which facilities an inmate can be assigned. Connecticut's correctional facilities are broken down into categories 1 through 5, with level 5 being the highest security level facility.  A level 2 correctional facility is a minimum security level correction facility, and a level 1 correction facility is essentially release to a half-way house or supervised home release, neither of which is run by the DOC itself.  (Levesque Aff. ¶¶ 4, 13.) The DOC's current inmate classification process is outlined in the 2005 Objective Classification Manual (the "Classification Manual" or "Manual"), but the DOC has used this classification system in generally the same manner since before Plaintiff commenced his incarceration in 1996. (<u>Id.</u> at ¶¶ 5, 9.)  The Overall Risk Level of an inmate is primarily determined by his seven individual risk scores, each of which is assigned a numerical score between 1 and 5 as follows:

      1.     Escape Profile
      2.     Severity/Violence of the Current Offense(s)
      3.     History of Violence
      4.     Length of Sentence
      5.     Presence of Pending Charges and/or Detainers
      6.     Disciplinary History
      7.     Security Risk Group Membership

(<u>Id.</u> at ¶ 6.)  Each inmate's needs are also assessed in seven different areas, each of which is also assigned a numerical score between 1 and 5:

1.      Medical Needs
2.      Mental Health Needs
3.      Education Needs
4.      Vocational and Work Skills Needs
5.      Substance Abuse Needs
6.      Sex Offense Treatment Needs
7.      Community Resource Needs

(Id. at ¶ 7.)  Defendants emphasize that because the DOC assesses every inmate's overall needs by evaluating and assigning a numerical score to each of the above subcategory of needs, every inmate receives a Sex Offense Treatment Needs (SOTN) score.  (Id. at ¶ 8.)  Plaintiff, on the other hand, argues that having a high-level SOTN score classifies an inmate as a 'sex offender' within the prison system.  Plaintiff also claims that the Classification Manual is ambiguous in that it fails to define "sexual offense."  (Am. Compl. ¶ 38.)

The DOC is not required by its Classification Manual or any other policy to assign risk or needs scores to inmates solely on the basis of conviction information (Levesque Aff. ¶ 21), and convictions for sexual offenses are not the only criteria applied by the DOC in determining an SOTN score of 2 or higher.  (Id. ¶ 23.)  Rather, the Classification Manual states: "The sex offense treatment needs score indicates an inmate *has a record or known history of problem sexual behavior."*  (Defs.' Ex. E, Classification Manual at 34 (emphasis added).)  The Classification Manual provides the following instructions in terms of considering an inmate's criminal charges when determining his risk and needs scores:

> No stand-alone charge for which the offender has been found not guilty or the charge nolled, or dismissed, may be used to determine any risk score.  If a charge for which the offender was found not guilty or the charge nolled or dismissed was included as one of multiple charges leading to a conviction as a result of a trial, plea bargain, and/or guilty plea, information as to the nolled or dismissed charge may be used to determine any risk score.

3

> **Nolled, acquitted, dismissed or withdrawn information**, which is part of another crime, may be used to determine needs scores based upon the description of the crime from police reports, PSI's, or other reliable investigative reports.
>
> **Nolled, dismissed or withdrawn information,** which is from a stand alone offense (crime in which no conviction was obtained) can not [sic] be used.
>
> **Substitute Information (SI)** may also be used if a description of the original charge is inclusive in the official report of the convicted offense.

(Id. at 4 (emphasis in original).)[1]  (The language in the manual was updated in 2006 but the policy has remained the same throughout the Plaintiff's incarceration.  (Levesque Aff. ¶ 45.  See also Pl.'s Ex. A, 2001 Classification Manual at 4; Pl.'s Ex. B, 2002 Classification Manual at 4.))  In his affidavit, Levesque attests that an inmate's "history need not only be established by the conviction of an inmate of a sex offense, but may also be established by conviction of an offense related to a sex crime of which the inmate was not convicted, or conviction of an offense clearly having a sexual element or committed for a sexual purpose."  (Levesque Aff. ¶ 18.)   The Manual further states that "Charges and convictions for 'Risk of Injury,' CGS 53-21(2)(a), involving victims age 16 or younger, are sexual in nature.  If the subsection (2) or (2)(a) is not present on the sentencing Mittimus, the case must be investigated further to determine if the offense is

---

[1]        The Manual appears to be internally inconsistent: while "nolle, acquitted, dismissed or withdrawn information" which is "part of another crime" may be used based upon the use of certain investigative reports, "nolle, dismissed, or withdrawn information" which is "from a stand alone crime" cannot be used.  The Manual does not define "stand alone offense," other than by the subordinate parenthetical referring to a "crime in which no conviction was obtained," which does not differentiate it from the term "another crime," and it does not otherwise explain the difference between information that is "part of another crime" and information that is "from a stand alone crime."  Reading the evidence in the light most favorable to the Plaintiff, the Court will assume that the Manual allows DOC officers to use nolle, acquitted, dismissed, or withdrawn information which is part of another crime (i.e. a crime for which no conviction was obtained) based on the use of certain investigative reports, notwithstanding its somewhat contradictory prohibition on the use of information from "stand alone crimes."

sexual in nature."[2]  (Defs.' Ex. E, Classification Manual at 35.)  Defendant Levesque explains in his affidavit that non-conviction information is used because of the common practice of plea bargaining: it is common for a person charged with a sex offense to plead to a lesser, non-sexual offense for a variety of reasons; and it is realistic that a person might have sex offense treatment needs despite not having been convicted of a sex offense beyond a reasonable doubt or pleading to a different charge.  (Levesque Aff. ¶¶ 19-20, 47.)

Generally an inmate's risk scores, not his needs scores, will determine an inmate's Overall Risk Level, which is usually the same as the highest of the risk scores.  (Levesque Aff. ¶ 11.)  However, an inmate with an SOTN score of 2 or higher may not be assigned an Overall Risk Level of 1 or 2 absent approval from the Commissioner or her designee (typically Defendant Levesque in his capacity as Director of Offender Classification and Population Management).  (Id. at ¶ 12.)  The DOC has also decided, pursuant to Conn. Gen. Stat. § 18-81, that an inmate serving a sentence for a sex-related offense or who has a history of a sex-related offense generally should not be housed in lower than a level 3 facility.  (Id. at ¶ 17.)  After

---

[2]  Conn. Gen. Stat. § 53-21(2)(a) provides: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child, or (3) permanently transfers the legal or physical custody of a child under the age of sixteen years to another person for money or other valuable consideration or acquires or receives the legal or physical custody of a child under the age of sixteen years from another person upon payment of money or other valuable consideration to such other person or a third person, except in connection with an adoption proceeding that complies with the provisions of chapter 803, shall be guilty of a class C felony for a violation of subdivision (1) or (3) of this subsection and a class B felony for a violation of subdivision (2) of this subsection, except that, if the violation is of subdivision (2) of this subsection and the victim of the offense is under thirteen years of age, such person shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court."

receiving an initial classification, inmates serving sentences less than five years or who have five years or less remaining in their sentence are generally reviewed for reclassification every six months.  The classification of inmates such as Mr. Vega who are serving sentences greater than five years are reviewed by DOC staff every year to determine if there has been any change in any of the risk scores or needs scores.  (Pl.'s Ex. J, Levesque Dep. at 40.)

The parties dispute whether receiving an SOTN score of 2 or higher constitutes being "labeled" as a sex offender.  Plaintiff argues that his score "labels" him a sex offender to the rest of the prison population and thereby stigmatizes him, while Defendants insist there is a difference between having a sex offense treatment needs score and being labeled a sex offender. Defendants maintain that the DOC does not consider inmates with an internal SOTN score of 3 or higher to be active or certain sex offenders, and an SOTN score of 2 or 3 does not reflect a "label" that an inmate is beyond reasonable doubt a sex offender.  (Levesque Aff. ¶¶ 24, 26.) Rather, such a score is an "internal score" indicating that the DOC will only place an inmate at a facility where he might voluntarily participate in sex offense treatment and where he might be supervised at a certain level of security, both for the safety of the community and the safety of correctional staff and other inmates.  (Id. at ¶¶ 25, 27, 29-30.)  Defendants also argue that Plaintiff hasn't been "classified" as a sex offender because there is no evidence presented that an SOTN score in Connecticut imposes formal requirements to participate in sex offender treatment programs, register as a sex offender upon discharge from prison, or otherwise be restricted in his eligibility for parole.  However, the DOC itself appears to use the terms "sex offense needs," "sex offender needs," and "sex offender" interchangeably.  For example, a DOC Administrative Directive dated September 15, 1999, states that a "Sex Offender Needs Score" (as opposed to the

"sex *offense* needs score" discussed by Defendants) "shall be assigned to a sentenced inmate consistent with the objective classification manual in accordance with Administrative Directive 9.2, Inmate Classification.  Each Classification counselor shall inform any inmate with a sex offender needs score of 2 or above of existing sex offender programs."  (Defs.' Ex. F ¶ 5.)  The directive also defines "sex offender" as "any sentenced inmate who has a sex offender needs score of 2 or above."  (Id. at ¶ 3(a).)  Common sense dictates that labeling someone as having sex offense or sex offender needs is the same as labeling him a sex offender.  See Thomas v. Warden, 49 Conn. Supp. 416, 424-25 (Conn. Super. Ct. 2005) ("When it walks like a duck, acts like a duck, and quacks like a duck, it *is* a duck!'  It is clear that the [Connecticut DOC] uses the terms 'sex offender needs' and 'sex offender' interchangeably.   The labeling of the petitioner as needing sex offender treatment and the designations by the respondent/department mentioned above clearly mean that the respondent/department has labeled the petitioner as a 'sex offender.'").  An SOTN score thereby stands on its own to classify someone as a sex offender, regardless of the ramifications of such a classification.

The parties also dispute the extent to which an inmate's risk scores are made available to other inmates and correctional officers.  Plaintiff ascribes the harms he has allegedly suffered in prison to the publicity of his SOTN score among inmates and correctional staff.  According to Defendants, however, the numerical scores given to inmates in arriving at their Overall Risk Scores are available only to correctional staff, the inmate, and the parole board.  (Levesque Aff. ¶ 31.)  Needs scores, including the SOTN scores, are shared only with the inmate himself and with staff members insofar as the needs score pertains to the care they are providing to the inmate. (Id. at ¶ 32.)  The majority of a prison's correctional staff, according to Defendants, is therefore

unaware of an inmate's SOTN score.  (Id. at ¶ 53.)  Defendants assert that during Defendant

Tokarz's tenure at the Department of Correction, no inmate classification information was shared

with inmates other than the one to whom it pertains.  (Defs.' Ex. M ¶¶ 2, 4, 6, 7.)  Defendants

also assert that they are not aware of any incidents, documented or otherwise, which occurred in

Connecticut prisons due to one inmate's becoming aware of another's SOTN score, nor has

Levesque become aware of any incident regarding mistreatment by staff after becoming aware of

an inmate's SOTN score.  (Levesque aff. ¶¶ 54-55; see also Tokarz Aff. ¶¶ 7-9. )  However,

Levesque acknowledges in his affidavit that inmates do become aware of crimes other inmates

have been convicted of or charged with through media reports, rumors, other inmates' knowledge

of a particular inmate, or an inmate's talking about himself.  (Levesque Aff. ¶ 35.)  Levesque also

admits that there are times when correctional facility staff may become aware of an inmate's

classification scores, but he maintains that the staff is generally aware of the policy of not

divulging personal inmate information lest staff or inmate safety be jeopardized.  (Id. at ¶¶ 36-

38.)

### B.    Plaintiff Vega

Mr. Vega is serving a 60-year sentence and is presently incarcerated at the MacDougall-

Walker Correctional Institution ("MacDougall") in Suffield, Connecticut.  Defendant Theresa

Lantz is the Connecticut Commissioner of Correction.  Defendant Jack F. Tokarz retired from the

DOC in April of 2003 at the rank of Deputy Commissioner of Programs and Staff Development

after 29 years of service in various capacities.  (Tokarz Aff. ¶ 2.)  In his capacity as Deputy

Commissioner, Tokarz oversaw the Offender Classification Division, among other services and

programs.  (Id. at ¶ 4.)  As the Director of Offender Classification/Population Management in the

8

DOC, Defendant Levesque oversees the assessment process of all inmates and the implementation of Connecticut's DNA and sexual offender registration laws with regard to the state's inmate population.  (Levesque Aff. ¶ 2.)  In this capacity he is responsible for overseeing the policies and procedures classifying inmates with an Overall Risk Level.  (Id. at ¶ 3.)  Mr. Levesque reported directly to Mr. Tokarz.  (Id. at ¶ 5.)

Mr. Vega is presently incarcerated for convictions on charges of: assault in the first degree with intent to disfigure, in violation of Conn. Gen. Stat. § 53a-59(a)(2); assault in the first degree with intent to cause serious physical harm, in violation of § 53a-59(a)(1); and kidnapping in the second degree, in violation of § 53a-94, all related to an incident that occurred in 1996. Mr. Vega was also charged with sexual assault in the first degree in violation of Conn. Gen. Stat. § 53a-70(a)(1) in connection with this incident, but the jury found him not guilty of that charge. There is no dispute that Mr. Vega was not convicted of any sexual offense per se.  (See Am. Compl. ¶ 16; Defs.' Mem. at 5.)  However, while Mr. Vega continues to assert that he has never committed nor been charged with any other sexually-related offense (see Vega Aff. ¶ 5), Defendants contend that the charges for which he was convicted contain sexual elements which legitimately contributed to the determination of his SOTN score.  (See Defs.' Mem. at 5.)

The facts surrounding the crimes for which Mr. Vega was convicted arose out of a long-term violent relationship with his 16-year old girlfriend and have been recounted in two state court decisions, one of which described them as "one of the most heinous set of facts this Division has heard."  State v. Vega, No. CR96115000, 2005 WL 3291928, at * 3 (Conn. Super. Oct. 26, 2005); see also State v. Vega, 259 Conn. 374, 379-80 (2002).  The horrible and grotesque details need not be extensively repeated here.  Suffice it to say that the domestic

violence incident in question occurred in January 1996 when Mr. Vega, after holding his victim and her eight-month old son locked in a bedroom for several days, repeatedly stabbed her with a knife, threw an air conditioner at her, and cut the nipple off her right breast and forced her to swallow it. Id., 259 Conn. at 379. The jury heard testimony regarding an alleged rape of the victim (based on allegations of forcible penetration of the victim with a foreign object in the course of this beating), but he was acquitted of the charge of sexual assault in the first degree. Id., 29 Conn. at 379 n.5. After further beating the victim, Mr. Vega drove her and her son for several hours through a snowstorm to a motel room, all the while refusing her requests to receive medical attention. At the motel, Vega forced the victim to smoke crack and have sex with him. Thereafter the police arrived and arrested him, and the victim was taken to the hospital for treatment. Id., 29 Conn. at 379-80. Mr. Vega continues to maintain his innocence and denies that he committed the acts for which he was convicted. (See Defs.' Ex. 5, Vega Dep. at 65-67; 82 (affirmatively answered question that he "never committed any crimes against the person of the young woman.").) He declined to be interviewed for his Pre-Sentence Investigation Report (see Pl.'s Ex. B), upon which the DOC classification officers relied in determining his risk and needs scores.

Upon incarceration subsequent to his arrest in 1996, Plaintiff Vega was initially assigned an Overall Risk Level of 4, based in part upon an assigned SOTN score of 1, with the subscore "U" for "unverified," pursuant to the Classification Manual then in effect. (Levesque Aff. ¶¶ 69-71, 82.) On June 25, 1997, Plaintiff was assigned an SOTN of 3, also with a subcode U, until December 1997, shortly after his conviction, when it was changed to "V" for "verified." (Id. at ¶¶ 72-73.) Since December 1997, his SOTN classification score has remained 3V. (Id. at ¶ 74.)

10

The Classification Manual describes the S-3 Assessment as follows:

> These individuals have a current conviction, pending charge or known history of sexual offenses involving physical contact with the victim(s) (necrophilia included).  The offenses may include coercion, manipulation, or exploitation.  This includes an offender who takes advantage of an opportunity where drugs and alcohol are being used as a tool.  An inmate who engages in predatory sexual behavior while incarcerated will be given a score of S-3.

(Defs.' Ex. E, Classification Manual at 36.)

Defendants explain that Plaintiff's SOTN score is justified by either of two reasons. First, Defendants contend that regardless of the status of his sexual assault charge, Mr. Vega's conviction charge of Assault in the First Degree pursuant to Conn. Gen. Stat. § 59(a)(2) on the basis of the mutilation and amputation of his victim's nipple, as reported in the Plaintiff's Pre-Sentence Investigation report and available to classification staff, is sufficient to warrant the Plaintiff's SOTN score under all versions of the Classification Manual.  (See Levesque Aff. ¶ 43; Ex. K.)  Second, under all versions of the Classification Manual, if an offender in the custody of the Commissioner is charged with multiple crimes and one of those crimes is a sexual crime, and the charges result in a conviction on any offense, an SOTN of 3 or more is assigned on the basis of the charges even if there is no conviction of a sexual assault or other sex offense.  (Levesque Aff. ¶ 44; Defs.' Ex. E, Classification Manual at 4-5; Ex. F; Ex. G.)  Because Plaintiff was initially charged with two counts of Sexual Assault in the First Degree and one count remained in the charges that the jury considered, and since there was a claim by the victim of rape, it was proper to assign Mr. Vega an SOTN score of 3 on the basis of the charges and the victim's claim as reported in the PSI Report.  (Levesque Aff. ¶ 44.)  Defendants justify this policy by explaining that an inmate who may have engaged in problem or criminal sexual behavior should

have every treatment opportunity for his own rehabilitation and for the sake of public safety (id. at ¶ 49), and, because there are finite resources available for lower security inmates, raising the Overall Risk Score of an inmate with a history of problem sexual behavior provides more opportunities for him to receive appropriate treatment.  (Id. at ¶ 50.)

Plaintiff, however, contends that the DOC has classified him as a sex offender based on a sexual assault charge of which he was acquitted and on the DOC's unsubstantiated belief that the charges for which he was convicted were sexual in nature, in violation of the procedures prescribed by the DOC's own classification manual.  Despite Mr. Vega's numerous requests, Defendants have repeatedly refused to reclassify him.  In a letter dated April 15, 2002, Deputy Commissioner Tokarz wrote to Plaintiff: "The Pre-Sentence Investigation Report in your case clearly indicates that elements of your crime were sexual in nature.  As such, your sexual treatment need score of level three (3) is in accordance with the Department of Correction Objective Classification Policy."  (Pl.'s Ex. F.)  Although Plaintiff had been afforded the opportunity to contest his PSI report and declined to do so, the record does not show that he was afforded a hearing or other means to challenge his SOTN risk score designation.

The evidence presented arguably shows a somewhat muddled approach taken by the DOC in reviewing Plaintiff's classification scores.  In a letter to Mr. Vega, a DOC classification officer explained his SOTN score on the ground that he was charged with, although not convicted of, sexual assault in the first degree.  This officer testified at a deposition that while a classification counselor is not allowed to use not guilty information in determining a needs score, at the time that she determined Mr. Vega had an SOTN score of S-E she did not know that he was found not guilty of sexual assault and made no effort to determine this fact.  (See Jones Dep. at 40, 42.)

12

This would suggest that the DOC considered the offense of which Mr. Vega was acquitted in determining his SOTN score. Defendant Levesque also explained at his deposition that, although Vega was acquitted of the sexual assault in the first degree charge, Levesque used that information in determining Vega's needs scores because Vega was convicted on other charges arising from the same overall incidence of violence, and that he used all of the information provided to him in the PSI to classify an individual inmate. (Levesque Dep. at 64.) Furthermore, Levesque testified that he did not consider the fact that Vega was found not guilty of sexual assault because he thought that dismissed charges are "similar" to charges for which the inmate was acquitted or found not guilty. (Id. at 72.) This evidence suggests that there is a lack of precision in the use of non-conviction information in determining the SOTN scores of Connecticut prisoners, as outlined by the Classification Manual guidelines and as implemented by the DOC staff, and nothing in the record shows that Vega or any other inmate has been offered a hearing or other opportunity to challenge his assigned sexual offense treatment needs score.

Mr. Vega alleges that classification as a sex offender has caused and will continue to cause him to face abuse, harassment, and a denial of programming offered by the DOC. At his deposition, Mr. Vega testified about several physical altercations with and threats by other inmates which he ascribes to their knowledge of his SOTN score. Defendant Levesque attests in his affidavit, however, that there have been no incidents, documented or undocumented, within Connecticut's prisons since 1996 which occurred due to one inmate's becoming aware of another inmate's SOTN score, nor is he aware of any mistreatment by staff who became aware of an inmate's SOTN score and used that information inappropriately. (Levesque Aff. ¶¶ 54-55.)

Defendants dismiss all of Plaintiff's alleged harms as conclusory allegations, except for one: there is no dispute that he was denied a job in May 2004 to be a school tutor on the basis of his SOTN score.  (Am. Compl. ¶ 36.)  Levesque attests, however, that given Vega's conviction history and non-conviction information, such programs are "clearly contra-indicated," presumably regardless of his SOTN score.  (Levesque Aff. ¶ 60.)[3]  Defendants further argue that Vega failed to connect this alleged denial of the job, or any other adverse treatment, to his internal SOTN score.  Defendants do admit, however, a factual dispute in terms of the consequences of Mr. Vega's SOTN score is the extent to which that information is known by other inmates.   (See Defs.' Reply at 15-16; Levesque Aff. ¶ 59.)

Plaintiff also alleges that what he considers the misclassification of his status affects his parole eligibility, which, given his SOTN score, requires that he participate in sexual treatment counseling.  Plaintiff claims that to participate in the sexual treatment counseling, he would be compelled to lie and incriminate himself as a sex offender.  (Am. Compl. ¶ 43.)  Defendants dispute Plaintiff's parole-related allegations, arguing that Plaintiff has not submitted any evidence in the form of a written policy, requirement, or affidavit by competent witness that his parole eligibility requirements are in any way dependent on his SOTN score.  In his affidavit, Levesque attests that offense treatment is "always voluntary"  (Levesque Aff. ¶ 16), and the DOC has "never" required any inmate, including Plaintiff, to go to sex offense treatment.  (Id. at ¶ 63.)  Levesque also attests that the DOC does not impose any penalties or loss of privileges on inmates

---

[3]  Defendants have not explained why such programs are 'clearly contra-indicated' given Vega's conviction history and nonconviction information.  It may be the case that his Overall Risk Security Score of 4 is determined by the severity of the violence of his current offense and the extreme length of his confinement, irrespective of his sexual offense history (see Defs.' Ex. K), but Defendants have not explicated this issue.

with SOTN scores who decline to participate in sex offense treatment programs.  (Id. at ¶ 65.)

Furthermore, any question of parole for Mr. Vega cannot be considered for many years.  Due to

the violent nature of his conviction offenses, Plaintiff Vega is required by state law to serve 85%

of his sentence before becoming eligible for parole.  (Id. at ¶ 75.)  At this rate, Plaintiff will

become eligible for parole in 2047.  Pursuant to DOC policies, inmates are eligible for Overall

Risk Score reductions after they serve various portions of their sentences.  After an Overall Risk

Level 4 inmate such as Plaintiff Vega has served 35% of his sentence, he may be considered for

an Overall Risk Level reduction to a Level 3.  To be considered for a further reduction from a

Level 3 to a Level 3 Overall Risk Level, inmates originally classified as Overall Risk Level 4

must have served an additional 30% of their sentence.   Inmates are not entitled to automatic

reductions in their risk level; rather, a reduction is granted depending on consideration of acts

such as the inmate's disciplinary report history and various program completion.  (Id. at ¶¶ 77-

81.)  Given the length-of-time requirement for level reduction eligibility, Plaintiff Vega will not

be eligible for an Overall Risk Level reduction from Level 4 to Level 3 until the year 2017, and

he would not be eligible for a reduction from Level 3 to Level 2, even if he had an SOTN score

of 1, until the year 2028.  (Id. at ¶¶ 83-84.)

## C.    Procedural Background

Plaintiff Vega, initially proceeding *pro se*,[4] filed this action in December 2003, but the

complaint was dismissed and judgment entered for the Defendants when Plaintiff failed to

complete service as directed.  Plaintiff successfully had the case reopened, and the Defendants

appeared and filed a motion to dismiss.  Plaintiff then filed an Amended Complaint, alleging

---

[4]        Counsel appeared for Plaintiff in January 2007.  (See Doc. Nos. 56-57.)

violations of his rights under the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution and seeking declaratory and injunctive relief.  Plaintiff brings seven causes of action: a substantive due process claim; a procedural due process claim that Defendants are violating their own internal policy; an equal protection claim based on allegedly different treatment of Plaintiff from others similarly situated; an Eighth Amendment claim; and a claim that Defendants are conditioning his parole eligibility on sex offender treatment.  (Am. Compl. ¶ 55.)  Plaintiff claims that the DOC's actions, enforced and upheld by defendants Theresa Lantz, Frederick Levesque, and Jack Tokarz, deprived Mr. Vega of two separate liberty interests without due process of law in violation of the Fourteenth Amendment: (1) a liberty interest in his classification as a sex offender; and (2) a state-created liberty interest in not being labeled as a sex offender.  Plaintiff subsequently moved for an "Immediate Preliminary Injunction." Magistrate Judge Margolis issued a recommended ruling, which this Court adopted, denying the preliminary injunction because Plaintiff did not have a substantial likelihood of success on the merits.  (See Doc. No. 91.)

Plaintiff has moved for summary judgment on the First Count of his Amended Complaint, alleging that Defendants have violated his due process rights under the Fourteenth Amendment by classifying him as a sexual offender when he was never convicted of a sexual offense.  Defendants have filed a cross-motion for summary judgment on all counts of the Amended Complaint on the basis that Plaintiff has no cognizable claim of any constitutional violation and that they are entitled to qualified immunity.  Defendants also move for summary judgment on Plaintiff's claims for declaratory and injunctive relief and for damages related to his Overall Risk Level or his parole eligibility on the basis that these claims are not ripe for

adjudication.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  No genuine issue of material fact exists when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The initial burden falls on the moving party, who is required to "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)(2).  The non-moving party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

The same legal standards apply when considering cross-motions for summary judgment.

17

A court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004) (citations omitted); see also Scholastic, Inc. v. Harris, 259 F.3d 73, 81 (2d Cir. 2001). A court must deny both parties' motions for summary judgment if it finds the existence of disputed material facts. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). Therefore, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citation omitted).

## III.   DISCUSSION

### A.      Sovereign Immunity

Plaintiff's claims, alleged when he was proceeding *pro se,* are against Commissioner Theresa Lantz in her official capacity and against Tokarz and Levesque in both their individual and official capacities. All of Plaintiff's claims for monetary damages against the defendants in their official capacities are barred by the Eleventh Amendment. Florida Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 684, 102 S. Ct. 3304, 73 L. Ed. 2d 1057 (1982) (suit for recovery of money may not be maintained against the state itself, or any agency or department of the state, unless the state has waived its sovereign immunity under the Eleventh Amendment); Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (Eleventh Amendment immunity which protects the state from suits for monetary relief also protects state officials sued for damages in their official capacity). Judgment should therefore be granted to Defendants for all claims for damages against Lantz and those claims against Tokarz and Levesque in their official capacities.

18

### B.      Ripeness

Defendants argue in their summary judgment motion that any claim pertaining to the effect of Mr. Vega's SOTN score on his parole eligibility is not ripe for review in this court because of the remoteness of such eligibility.  "[T]he fundamental concern of ripeness is whether *at the time* of the litigation the issues in the case are 'fit' for judicial decision.  The concept of ripeness ... recognizes ... that some disputes mature in stages, going through preliminary phases during which the injury is as yet but a speculative possibility, too remote or hypothetical to warrant present submission to a federal court.  Such a dispute is considered as yet 'unripe' for adjudication."  Bronx Household of Faith v. Bd. of Educ. of City of N.Y., 492 F.3d 89, 111 (2d Cir. 2007) (Calabresi, J., concurring) (emphasis in original) (internal citations and quotations omitted).  Ripeness principles "bear heightened importance when ... the potentially unripe question presented for review is a constitutional question."  Id. at 114.  "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable."  Spector Motor Serv. v. McLaughlin, 323 U.S. 101, 105, 65 S. Ct. 152, 89 L. Ed. 101 (1944).

Due to the violence of Plaintiff's conviction offenses, Connecticut law requires that he serve 85% of the sentence imposed before being considered eligible for parole.  Conn. Gen. Stat. § 54-125a.  (See also Levesque Aff. ¶ 75.)  Thus he will not be considered parole eligible until 2047.  He also will not be eligible for an Overall Risk Level reduction to level 3 until he has served 35 % of his sentence in 2017 and, assuming he receives that reduction (which is not automatic), he will then not be eligible for an Overall Risk Level reduction from level 3 to level 2 until he has served another 30% of his sentence, at the earliest in the year 2028.  Connecticut's

19

parole eligibility policies and the DOC's internal classification procedures may change

significantly in the 20 or 40 years before Mr. Vega can be considered for either a classification

reduction or parole eligibility.  His challenges of the conditions on his parole eligibility and the

effect of his SOTN score on his parole eligibility are so far in the future, and susceptible to

possible changes, that they are not ripe for review at this time.  See United States v. Balon, 384

F.3d 38, 46 (2d Cir. 2004) (claims challenging the conditions of an inmate's supervised release

were not ripe when he was not due for release for three years and the question concerned

technology, which advances rapidly over a five-year period).[5]

### C.    Due Process

The crux of Plaintiff's lawsuit, and the central issue argued and analyzed by the parties'

cross-motions for summary judgment, is whether Plaintiff's due process rights have been

violated by his classification as a sex offender when he was not convicted of a sexual offense.

The Fourteenth Amendment prohibits deprivations of life, liberty, or property without due

process of law.  See, e.g., Wilkinson v. Austin, 545 U.S. 209, 221, 125 S. Ct. 2384, 162 L. Ed. 2d

174 (2005).  Although finding a procedural due process violation in a prison setting is

particularly daunting, "a prisoner is not wholly stripped of constitutional protections when he is

imprisoned for crime."  Wolff v. McDonnell, 418 U.S. 539, 555, 94 S. Ct. 2963, 41 L. Ed. 2d

935 (1974).  To establish a claim for a denial of procedural due process, a prisoner must have

---

[5]    Plaintiff argues that his parole eligibility concerns must be addressed now lest they be deemed waived in the future, citing case law suggesting that Plaintiff may waive his claims in connection with parole if he does not raise them at the earliest possible instance.  See, e.g., Benchoff v. Colleran, 404 F.3d 812, 819-20 (3d Cir. 2005) (citing Rose v. Lundy, 455 U.S. 509, 521, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982)).  However, such cases deal with the context of successive habeas petitions, a matter wholly distinct from whether an alleged constitutional violation is ripe for review, and no other precedent has been brought to this Court's attention suggesting a waiver in this instance.

possessed a valid liberty interest and been denied the requisite process before a deprivation of

that interest.  Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000); see also Bd. of Regents v. Roth,

408 U.S. 564, 569-70, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).  A liberty interest may arise from

the Constitution itself, by reason of guarantees implicit in the word "liberty," see, e.g., Vitek v.

Jones, 445 U.S. 480, 493-94, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980) (liberty interest in

avoiding involuntary psychiatric treatment and transfer to mental institution), or it may arise from

an expectation or interest created by state laws or policies.  See, e.g., Wolff, 418 U.S. at 556-558,

94 S. Ct. 2963 (liberty interest in avoiding withdrawal of state-created system of good-time

credits).  If a protected liberty interest is implicated, a court must then proceed to determine

whether the plaintiff was deprived of that interest without due process of law.  Perry v.

McDonald, 280 F.3d 159, 173 (2d Cir. 2001) (quoting Narumanchi v. Bd. of Trs. of Conn. State

Univ., 850 F.2d 70, 72 (2d Cir. 1988)).

       In the prison context, a liberty interest arising from the Constitution itself is implicated

and a prisoner is entitled to procedural protections when a change in his confinement is so severe

that it essentially exceeds the sentence imposed by the court.  Kirby v. Siegelman, 195 F.3d 1285,

1291 (11th Cir. 1999) (citing Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed.

2d 418 (1995), and Vitek, 445 U.S. at 492-93, 100 S. Ct. 1254).  State statutes and prison

regulations may also grant prisoners liberty interests that invoke due process protections.

Meachum v. Fano, 427 U.S. 215, 223-27, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976).  "[T]hese

interests will be generally limited to freedom from restraint which, while not exceeding the

sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of

its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to

the ordinary incidents of prison life." Sandin, 515 U.S. at 483, 115 S. Ct. 2293 (citations

omitted).  A prisoner does not have a constitutional right to be housed at a particular institution,

Meachum, 427 U.S. at 224, 96 S. Ct. 2532, to receive a particular security classification, Moody

v. Daggett, 429 U.S. 78, 98 n.9, 97 S. Ct. 274, 50 L. Ed. 2d 236 (1976), or to be released on

parole.  Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1, 7, 99 S.

Ct. 2100, 60 L. Ed. 2d 668 (1979).

Plaintiff argues that he has both a constitutionally protected interest and a state-created

liberty interest in not being labeled a sex offender after having been acquitted of the sexual

assault charge against him at trial.  Plaintiff first argues that he has been deprived of his interest

in being free from unwarranted harm to his reputation and burdensome state-imposed

consequences, satisfying the "stigma-plus" test first articulated in Paul v. Davis, 424 U.S. 693, 96

S. Ct. 1155, 47 L. Ed. 2d 405 (1976).  Plaintiff also argues that he has state-created liberty

interest under Sandin v. Connor, 515 U.S. at 484, 115 S. Ct. 2293, in being free from the

utilization of information underlying a charge of which he was acquitted to classify him as a sex

offender.  Plaintiff further argues that the DOC has created a liberty interest in an inmate's being

assigned overall risk and needs scores that result in the "appropriate" confinement location,

treatment, and programs, an interest which is violated by classifying Mr. Vega as a sex offender

despite his acquittal on the sexual assault charge.  Each of these alleged liberty interests and the

allegedly impermissible deprivations of them will be considered in turn.

### 1.    Constitutionally Protected Liberty Interest and "Stigma-Plus"

A central issue in this case is whether classification of an inmate as a sex offender

intrudes on a constitutionally protected liberty interest, an issue not yet addressed by the Second

Circuit.  Four of the five other circuits, however, which have addressed the specific issue of inmate sex offender classification have found a constitutionally protected liberty interest that triggers due process protections.[6]  The Ninth Circuit, reviewing a sex offender statute under which the Hawaii Parole Authority agreed to identify as sex offenders all inmates who had been convicted of a sex offense or who had engaged in sexual misconduct during the commission of a crime, decided that the combination of the stigmatizing consequence of being labeled a sex offender combined with the mandatory completion of a treatment program created "the kind of deprivations of liberty that require procedural protections."  Neal v. Shimoda, 131 F.3d 818, 830 (9th Cir. 1997).  The Ninth Circuit based its decision on Vitek v. Jones, in which the Supreme Court held that a state procedure identifying inmates as mentally ill and transferring them to mental institutions without a hearing was "more than a loss of freedom from confinement," 445 U.S. at 492, 100 S. Ct. 1254, and beyond the range of conditions of confinement justified by a prison sentence.  Id., 445 U.S. at 493, 100 S. Ct. 1254.  Relying on Vitek, the court of appeals held that Hawaii could not classify inmates as sex offenders and mandate their participation in treatment programs as a condition for parole without holding a hearing that complies with Wolff v. McDonnell, 418 U.S. at 563, 566, 571, 94 S. Ct. 2963 (requiring "advance written notice of the claimed violation and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken," a chance to "call witnesses and present

---

[6]     The Eighth Circuit has considered the related question of whether a state must afford a prisoner any process before requiring him to register under the state's predatory offender registration statute.  Gunderson v. Hvass, 339 F.3d 639, 644 (8th Cir. 2003).  In Gunderson, the Eighth Circuit concluded that no liberty interest was violated because the plaintiff only alleged a harm to his reputation, but not any additional "plus" factor; it did not squarely address whether, harms aside, plaintiff had a protected liberty interest in not being a registered sex offender.

documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals," and an impartial decision maker).  "We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender."  Neal, 131 F.3d at 829.

Three other circuits have adopted the reasoning of Neal and held that an inmate's classification as a sex offender implicates a liberty interest under the Due Process Clause.  See Coleman v. Dretke, 395 F.3d 216, 222 (5th Cir. 2004) ("prisoners who have not been convicted of a sex offense have a liberty interest created by the Due Process Clause in freedom from sex offender classifications and conditions."); Chambers v. Colorado Dep't of Corr., 205 F.3d 1237, 1242 (10th Cir. 2000) (holding that the sex offender label is "replete with inchoate stigmatization," the consequences of which are "something of value entitled to procedural due process"); Kirby v. Siegelman, 195 F.3d 1285, 1291-92 (11th Cir. 1999) (even after a defendant's conviction, "he retained a 'residuum of liberty' that would be infringed by classification as a sex offender without complying with minimum requirements of due process." (citing Vitek, 445 at U.S. 491, 100 S. Ct. 1254)).  See also Gwinn v. Awmiller, 354 F.3d 1211, 1218-19 (10th Cir. 2004) (liberty interest implicated where an inmate's classification as a sex offender reduced the rate at which he could earn good time credits); Roper v. Campbell, No. 2:04-cv-1156, 2007 WL 604789, at *1 n.4 (M.D. Ala. Feb. 22, 2007); Noble v. Bd. of Parole & Post-Prison Supervision, 964 P.2d 990, 995-97 (Or. 1998).  But see Grennier v. Frank, 453 F.3d 442, 445 (7th Cir. 2006) (concluding that a sex offense label, even if stigmatizing, does not give

rise to a protected liberty interest);[7] Kritenbrink v. Crawford, 457 F. Supp. 2d 1139, 1146 (D. Nev. 2006) (finding a state-created interest but no constitutionally protected liberty interest where classification did not compel inmates to participate in mandatory treatment programs); Tinsley v. Goord, No. 05-cv-3921 (NRB), 2006 WL 2707324, at *5 (S.D.N.Y. Sept. 20, 2006) (noting that the Second Circuit has "not yet so held and other case law suggests that inmates do not have a constitutionally protected liberty or property interest in internal prison classifications.").

In 2005, the Superior Court of Connecticut, relying on Coleman, Gwinn, Chambers, Kirby, and Neal, held that a DOC inmate who was acquitted of sexual assault has "a liberty interest in not being labeled as a sex offender and that that liberty interest has been violated by the [Connecticut DOC] in so labeling him." Thomas v. Warden, 49 Conn. Supp. at 440-41. Plaintiff Thomas, an inmate at MacDougall-Walker (where Plaintiff Vega is currently incarcerated) filed a petition for habeas corpus claiming that he was wrongly classified as a sex offender even though he was acquitted of a sexual assault charge by a jury. Thomas was incarcerated as a result of a conviction on other charges, and he was classified with an S-3 SOTN score. The Superior Court granted the writ of habeas and ordered the DOC to: purge all records referring to Thomas as a sex offender or in need of sex offender treatment; reduce his SOTN score and his overall risk score; and "rely no further on any sex offender charge, police report

---

[7]        The Seventh Circuit denied Grennier's due process claim in part by concluding that Neal, Chambers, and Kirby had found liberty or property interests stemming from statutes and regulations above and beyond the sex offender classification. 453 F.3d at 445. According to the Seventh Circuit, the other courts of appeals had not found a general constitutionally protected liberty interest in not being labeled a sex offender; rather, the particular regulatory framework before each appellate court had created a liberty interest and required a hearing to satisfy due process. This Court respectfully disagrees with the Seventh Circuit's interpretation of Neal, Kirby, and Coleman, which this Courts reads to flatly and broadly state that a prisoner who was not convicted of a sex offense has a constitutionally protected liberty interest in not being labeled a sex offender.

25

and/or presentence investigation report as they relate to the petitioner having committed a sexual offense in classifying him." Id. at 441.  Compare Weinberg v. Radgowski, No. 563929, 2003 WL 1787944, at *1 (Conn. Super. Ct. March 18, 2003) (declining to hold that a  liberty interest is implicated in an inmate's internal sex offender treatment score); Carpenter v. Warden-Cheshire, No. 980418564S, 2000 WL 1912697, at *4 (Conn. Super. Ct. Dec. 14, 2000) (same).  Plaintiff Vega now urges this Court to follow Thomas and hold that a prisoner has a constitutionally protected liberty interest in not being classified as a sex offender in prison when he was acquitted by a jury of the pending sexual assault charge.

This Court hereby adopts the reasoning of Thomas and the 5th, 9th, 10th, and 11th Circuits and holds that being classified as a sex offender invokes a constitutionally protected liberty interest.  District and circuit courts may look to the law of sister jurisdictions when there is no controlling law on point in their own jurisdiction.  See, e.g., D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 599 (2d Cir. 2005) (setting forth that "[s]everal district courts of our circuit, while noting that we have not decided the issue, have followed the approach of our sister circuits.").  As the Ninth Circuit wrote in Neal, "[t]he classification of an inmate as a sex offender is precisely the type of 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' that the Supreme Court held created a protected liberty interest." Neal, 131 F.3d at 829 (quoting Sandin, 515 U.S. at 482, 115 S. Ct. 2393).  Plaintiff Vega testified at his deposition that he has suffered insults and fights with other inmates because he is rumored to be a rapist, and a DOC classification counselor told him that he was being harassed and transferred between facilities because of his S-3 SOTN score.  (Pl.'s Mem. at 7-8, 28; Vega Dep. at 79, 101, 117.)  In addition to the stigma resulting from whatever extent the sex offender

classification becomes public knowledge, such a classification results in the deprivations of certain rights and/or credits in prison, such as required therapy and conditions of consideration for parole, which constitute atypical and significant hardships over and beyond those normally imposed on an inmate.

Being classified in prison as a sex offender not only invokes a constitutionally protected liberty interest but it causes a "stigma-plus" under Paul v. Davis.  In Paul, the Supreme Court held that damage to an individual's reputation can constitute a due process claim when a petitioner can demonstrate the existence of two criteria: first, the utterance of a statement about them that is sufficiently derogatory to injure their reputation, that is capable of being proved false, and that they claim is false; second, some tangible and material state-imposed burden or alteration of their status or of a right in addition to the stigmatizing statement.  Paul, 424 U.S. at 701-10, 96 S. Ct. 1155.  There is no question that "being labeled as a sex offender by the [DOC] is sufficiently derogatory to injure his reputation."  Thomas, 49 Conn. Supp. at 425.  As the Tenth Circuit has written, the sex offender label is "replete with inchoate stigmatization," Chambers, 205 F.3d at 1242 , and the label itself satisfies the "stigma" prong of the stigma-plus test.  See Kritenbrink, 457 F. Supp. 2d at 1146 ("as a matter of law, Plaintiff need not show sitgmatization resulting from [sex offender] classification.").

In addition to facing a stigma, Vega must satisfy the "plus" factor by showing that, as a result of his classification, he faces further tangible and material adverse consequences.  The "plus" factor need not rise to the level of an independent liberty deprivation; rather, it requires only that the plaintiff point to "an indicium of material government involvement unique to the government's public role that distinguishes his or her claim from a traditional state-law

defamation suit." Doe v. Dep't of Public Safety ex rel. Lee, 271 F.3d 38, 56 (2d Cir. 2001),

rev'd on other grounds, Conn. Dep't of Public Safety v. Doe, 538 U.S. 1, 123 S. Ct. 1160, 155 L.

Ed. 2d 98 (2003). Plaintiff Vega shows that he was denied positions in prison tutoring and

mentoring programs at least in part because of his S-3 SOTN score, and Defendants do not

dispute these facts. Vega's inability to participate in certain tutor and mentoring programs

because of his S-3 score, in addition to his ineligibility for other programs and lesser security

facilities, constitute denials beyond the ordinary incidents of prison life. Although an inmate is

not entitled to a particular placement, he would not seem to be legitimately excluded from

placement in certain programs or lesser security facilities on the basis of an unfounded factual

scenario determined without due process. See Thomas, 49 Conn. Supp. at 430 (a prisoner met

the stigma-plus test where his Level 3 SOTN score resulted in his not having his overall risk

score reduced, which then rendered him ineligible for certain programs, placement in a minimum

security facility or a halfway house, work release, educational work release, or community

release); but see Kritenbrink, 457 F. Supp. 2d at 1147 (where a plaintiff did not allege mandatory

participation in a treatment program, his "stigma plus the denial of minimum security

classification and work camp assignments does not constitute conditions of confinement

exceeding his sentence in an unexpected manner so as to give rise to a liberty interest under the

Due Process Clause itself."). For these reasons, the Court concludes that the stigmatizing

consequences of Vega's SOTN score, coupled with the adverse consequences of that score,

create the kind of deprivations of liberty that require procedural protections. See Neal, 131 F.3d

at 829.

     Defendants argue that no due process violation is implicated in Mr. Vega's case because

he was actually convicted of a sex offense, despite his acquittal of a sexual assault charge at trial.

Defendants contend that because Vega was convicted of mutilating his female victim's nipple,

the crime for which he was sentenced was sexual in nature.  There is no dispute that Vega was

convicted of assault involving mutilation of a woman's nipple, but Vega argues that Defendants

have presented no evidence that his crime was sexual in nature, other than their allegation that

the breast is a "sexual organ" and the classification officers' subjective determination that Vega's

offenses were sexual.  (See Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. at 5; Levesque Dep.

at 65 ("When reading the PSI and the state's version of the actual incident itself, I believed or

believe today that there was a sexual component involved in the actual incident.").)

Disfigurement and/or mutilation generally would not necessarily be considered sexual in nature,

but there are numerous reasons why the crimes for which Vega was convicted could be found to

reflect problematic sexual attitudes and behavior which justify labeling his crimes "sexual

offenses," not the least of which is the law's consideration of a breast as a "sexual organ."  See

Conn. Gen. Stat. §§ 53a-65(3), (8) (state criminal code defining "sexual contact" as contact with

the "intimate parts" of a person, which include "the genital area..., groin, anus..., inner thighs,

buttocks, or breasts."); 18 U.S.C. § 2246(3) (federal criminal code defining "sexual contact" as

the "intentional touching, either directly or through the clothing, of the genitalia, anus, groin,

breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, degrade, or

arouse or gratify the sexual desire of any person.").  However, it is not for this Court to decide

whether the crimes for which Vega was convicted were "sexual."  See Roper, 2007 WL 604789

at *3 (where the state criminal code's definition of 'indecent exposure' used at the time of

plaintiff's conviction did not contain an element with respect to sexual desire, it was not clear

that conviction for such offense, standing alone, constituted a sexual offense, prompting the court to consider the 14th Amendment question).  Before the Court is simply the question of whether Vega is entitled to due process before such a decision is made.  Even if it is proper for the DOC to classify Vega as a sex offender given the facts surrounding his offenses, it can only do so after a due process hearing.

Defendants also contend that Plaintiff has not suffered a constitutional deprivation because, due to his other risk factors, he would be ineligible for the specific tutor and mentoring programs he cites and ineligible for a transfer to other minimum security programs and facilities even if his SOTN score were reduced.  (See Defs.' Mem. at 39; Levesque Aff. ¶ 60.)  Certainly, given the violence of the crimes for which he was convicted and the exceptionally long term of his sentence, it would not be surprising if his SOTN score were not solely responsible for his ineligibility for various lower security placements.  However, these factual circumstances do not alter the Court's holding that Vega's classification as a sex offender without having been convicted of a sex offense invokes a constitutionally protected liberty interest that triggers due process.  The particular circumstances of Vega's incarceration and the practical ramifications of his SOTN score may be validly considered only after he has been afforded due process to challenge his SOTN score.

### 2.    State-Created Liberty Interest

Distinct from the question whether Plaintiff has a Due Process Clause interest in not being classified as a sex offender is the question whether he has a state-created liberty interest in the DOC's not using a charge for which he was acquitted to determine his SOTN and overall risk scores.  "It is beyond dispute that state statutes and regulations may create liberty interests that

30

are entitled to the procedural protections of the Due Process Clause." <u>Kirby</u>, 195 F.3d at 1291

(<u>citing</u> <u>Vitek</u>, 445 U.S. at 488, 100 S. Ct. 1254).  To constitute a deprivation of liberty, a restraint

imposed by the state must have imposed an "atypical and significant hardship on the inmate in

relation to the ordinary incidents of prison life." <u>Sandin</u>, 515 U.S. at 484, 115 S. Ct. 2293.  To

show a due process violation, a prisoner must establish that "the state has granted its inmates, by

regulation or by statute, a protected liberty interest in remaining free from that confinement or

restraint." <u>Frazier v. Coughlin</u>, 81 F.3d 313, 317 (2d Cir. 1996).  <u>See also</u> <u>Welch v. Bartlett</u>, 196

F.3d 389, 392-93 (2d Cir. 1999).

The Second Circuit has described an "atypical and significant hardship" as "a hardship

that is substantially more grave than hardships [an inmate] would be likely to endure simply as a

consequence of the ordinary administration of the prison." <u>Welch</u>, 196 F.3d at 392.  It is well-

settled that prisoners generally do not have a protected liberty interest in classifications that

impact their eligibility to participate in rehabilitative programs.  <u>See</u> <u>Moody</u>, 429 U.S. at 88 n.9,

97 S. Ct. 274; <u>see also</u> <u>Green v. Armstrong</u>, No. 98-3707, 1999 WL 642910, at *1 (2d Cir. Aug.

20, 1999); <u>Pugliese v. Nelson</u>, 617 F.2d 916, 923 (2d Cir. 1980).  Prisoners also do not have a

due process right to challenge their assignment to a particular facility, <u>Prins v. Coughlin</u>, 76 F.3d

504, 507 (2d Cir. 1996) (<u>citing</u> <u>Meachum</u>, 427 U.S. at 225, 96 S. Ct. 2532), and therefore do not

have a due process right to challenge a classification that might thwart their ability to transfer to

another facility.  <u>Taylor v. Levesque</u>, No. 06-0356-pr, 246 F. App'x 772, 774 (2d Cir. 2007).

Connecticut has not granted inmates, by regulation or statute, a protected interest in their security

classifications; rather, the matter is committed to the discretion of the Commissioner of the DOC.

<u>Wheway v. Warden</u>, 215 Conn. 418, 432 (1990); <u>Santiago v. Comm'r of Corr.</u>, 39 Conn. App.

674, 680 (Conn. App. Ct. 1995).

However, the DOC has created a liberty interest in not being assigned an SOTN score on the basis of a charge for which an inmate has been acquitted. The DOC Classification Manual instructs classification officers to assign risk and needs scores that result in the "appropriate confinement location, treatment, programs, and employment assignment whether in a facility or in the community." (See Def.'s Ex. E, Classification Manual at 2, 4 (emphasis added).) DOC policy limits the information that can be used to determine needs scores so as to exclude information on charges for which an inmate was acquitted. The Classification Manual states: "Nolled, dismissed or withdrawn information, which is part of another crime, may be used to determine needs scores based upon the description of the crime from police reports, PSIs, or other reliable investigative reports." (Id. at 4.) In Thomas, the Connecticut court determined that the DOC "deliberately omitted acquittals" from the language of this provision with the intent to preclude the use of police reports and PSIs relating to charges for which a jury found a prisoner not guilty. Thomas, 49 Conn. Supp. at 423. Furthermore, the DOC Manual specifically states that "no charge for which the offender has been found not guilty or the charge nolled, or dismissed, may be used to determine any risk score." (Defs.' Ex. E, Classification Manual at 36.)

In this case, Defendants have therefore deprived Vega of the policy-created liberty interest by assigning him an SOTN score on the basis of the charge of which he was acquitted and factoring that acquittal information into his overall risk score without providing adequate procedural protections. Labeling an inmate a sex offender in the circumstances described results in concrete adverse consequences, from denial of participation in certain treatment programs to threats of harassment by other inmates and correctional staff, and is "precisely the type of

32

'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison

life' that the Supreme Court held created a protected liberty interest." Neal, 131 F.3d at 829

(quoting Sandin, 515 U.S. at 482, 115 S. Ct. 2292).  See also Kritenbrink, 457 F. Supp. 2d  at

1148-49.  "[W]rongfully labeling the petitioner as a sex offender with an S-3 overall risk score

results in his being burdened by an atypical and significant hardship in that it is substantially

more grave than hardships the inmate would be likely to endure simply as a consequence of the

ordinary administration of the prison.... The hardships on the petitioner, therefore, exceed the

expected circumstances in an unexpected manner." Thomas, 49 Conn. Supp. at 434-35.

Contrary to its stated goal of determining an appropriate treatment program, the DOC's reliance

on a charge of which an inmate had been acquitted is inappropriate in that it has no probative

value as to the inmate's conduct, propensity, or general proclivity, all of which the classification

and its consequences are intended to address.  If the DOC is to rely on such information in

making its sex offense classification decisions, it must provide the inmate with notice and an

opportunity to contest the accuracy and relevance of such information.

　　　The DOC Manual does allow the DOC to consider information regarding charges for

which an inmate was not convicted so long as that information is related to the charge for which

he was convicted.  (See Def.'s Ex. E, Classification Manual at 4 (allowing review of acquittal

information so long as not from a stand alone offense).)  In accordance with this provision,

Defendants argue that, although Plaintiff Vega was acquitted of the sexual assault charge arising

out of his prolonged and extensive torture of his victim, the DOC was entitled to consider all of

the information related to all of the charges arising out of this violent incident.  Furthermore, as

discussed above, the information underlying the mutilation and physical assault charges for

which he was convicted arguably contained a sexual element distinct from the sexual assault charge for which he was convicted which gave rise to his SOTN score.  While the Defendants in this case might have drawn reasonable conclusions about Vega's sex offense treatment needs from the information provided by the state, such conclusions are not properly considered unless due process is provided to Vega.

      **3.**     **What Process is Due**

For the reasons stated above, Plaintiff Vega is entitled to summary judgment on his procedural due process claim.  Identification of a liberty interest implicated in the assignment of an SOTN score of 2 or higher, however, does not complete the due process analysis; the Court must now determine what process is due.  Neal, 131 F.3d at 830.  The question is not whether the state can assign Mr. Vega a sexual offender treatment number score but what process he must be afforded in order to receive such a score.  The Due Process Clause, at a minimum, requires advance notice and an opportunity to be heard.  Id. at 831 n.14.  An inmate whom the prison intends to classify as a sex offender is therefore "entitled to a hearing at which he must be allowed to call witnesses and present documentary evidence in his defense," id. at 831, but the "'play in the joints of the Due Process Clause' allows states to flesh out the details defining the limits of such a hearing."  Id. at 831 n.14 (citing Wolff, 418 U.S. at 567, 94 S. Ct. 2963).  Mr. Vega requests, in addition to damages, various forms of injunctive relief, including the removal of his SOTN score in all of his records and a transfer to the facility of his choice.  However, such remedies would be extraordinary and inappropriate at this time; rather, the appropriate remedy for a due process violation is due process, i.e. a hearing.  See U.S. ex rel Bey v. Conn. State Bd. of Parole, 443 F.2d 1079, 1089-90 (2d Cir.), vacated on other grounds, Conn. State Bd. of Parole

v. Bey, 404 U.S. 879, 92 S. Ct. 196, 30 L. Ed. 2d 159 (1971).  Before being labeled as a sex

offender and subjected to the adverse consequences of an SOTN score of 2 or higher, an inmate

like Vega is entitled to notice of the reasons for such a classification and an opportunity to

formally challenge the assignment of that classification in an adversarial setting in compliance

with the procedural protections outlined by the Supreme Court in Wolff.  Neal, 131 F.3d at 831,

832.  See also Wolff, 418 U.S. at 563, 566, 94 S.Ct. 2963; Anderson v. Recore,  446 F.3d 324,

333 (2d Cir. 2006).[8]

Defendants, however, are entitled to qualified immunity on Plaintiff's claim for damages.

State officials, including prison officials, sued in their individual capacities are entitled to

qualified immunity to the extent that their conduct does not violate clearly established statutory

or constitutional rights.  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d

396 (1982); Procunier v. Navarette, 434 U.S. 555, 561-62, 98 S. Ct. 855, 55 L. Ed. 2d 24 (1978);

Iqbal v. Hasty, 490 F.3d 143, 152 (2d Cir. 2007).  Assertion of a government official's qualified

immunity privilege should be upheld unless the "contours of the right" were "sufficiently clear

that a reasonable officer would understand that what he is doing violates that right."  Anderson v.

Creighton, 483 U.S. 635, 640 (1987); see also Behrens v. Pelletier, 516 U.S. 299, 306-07, 116 S.

Ct. 834, 133 L. Ed. 2d 773 (1996).  Plaintiff argues that the DOC was clearly on notice that

labeling an inmate as a sex offender without having been convicted of a sex offense is a violation

of his clearly established due process rights.  However, contrary to Plaintiff's assertions, there is

---

[8]    The Court takes no position on which procedures Defendants and the DOC may use to comply with this requirement, as the sufficiency of any particular procedure has not been presented in this case for judicial review.  See Krimstock v. Kelly, 306 F.3d 40, 69 (2d Cir. 2002) (observing that there is no "universal approach to satisfying the requirements of meaningful notice and opportunity to be heard").

no 'wealth of case law' on this issue (Pl.'s Reply at 12); as discussed above, this question has not been reviewed by the Second Circuit and only recently addressed by one Connecticut state court and one New York federal district court.  There was absolutely no case law on this question from anywhere in the country to guide the DOC when they determined Plaintiff's classification in 1996.  Accordingly, because the state of the law in this circuit was not established when the DOC classified Mr. Vega, the prison officials named in this lawsuit are entitled to qualified immunity. Plaintiff's claims for damages therefore cannot be sustained.  Chambers, 205 F.3d at 1244 (citing Neal, 131 F.3d at 832).

Vega is, however, entitled to injunctive relief, for which qualified immunity is no defense.  See Ward v. Housatonic Area Regional Transit Dist., 154 F. Supp. 2d 339, 346 (D. Conn. 2001).  Defendants are hereby ordered to vacate Vega's SOTN S-3 score unless and until he is provided all of the procedural protections due him under Wolff.

### D.     Eighth Amendment Claim

Plaintiff also claims that his SOTN score and its resulting adverse consequences constitute a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  Defendants are entitled to summary judgment on this claim.  The Supreme Court requires a State's conduct to be "so grave that it violates contemporary standards of decency" to constitute a violation of the Eighth Amendment.  Helling v. McKinney, 509 U.S. 25, 36, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993).  "The Eighth Amendment prohibits punishments which, although not physically barbarous, involve the unnecessary and wanton infliction of pain .... But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional."  Rhodes v. Chapman, 452 U.S. 337, 346-47, 101 S. Ct. 2392, 69 L. Ed. 2d 59

(1981).  In Neal, the Ninth Circuit, although finding a Due Process Clause violation, held that the State was not violating the Eighth Amendment because the State's program promoted "important and laudable goals" of identifying and treating sex offenders so as to reduce the rate of recidivism among inmates released from the system.  131 F.3d at 833 (citing Neal v. Shimoda, 905 F. Supp. 813, 820 (D. Haw. 1995)).  Furthermore, the institution of the program was within the State's authority as part of its correctional facilities.  Accordingly, the Ninth Circuit refused to conclude that the State's pursuit of these goals or operation of its sex offender treatment program violated "contemporary standards of decency."  Id.  See also Gwinn, 354 F.3d at 1228 (the denial of good time credits and other privileges as a result of his failure to admit committing a sexual assault does not violate the Eighth Amendment).  Despite their procedural inadequacies, the DOC policies regarding sex offense treatment needs serve laudable rehabilitative and safety goals, and nothing about Mr. Vega's allegations involve the infliction of pain that would give rise to a viable Eighth Amendment claim.  Accordingly, Defendants are entitled to summary judgment on this count.

## IV.    CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. No. 86] is **granted in part** and **denied in part**, and Defendants' Cross-Motion for Summary Judgment [Doc. No. 95] is **granted in part** and **denied in part.**  Plaintiff is granted summary judgment on his due process claim.  Defendants are entitled to qualified immunity on Plaintiff's request for damages, but Plaintiff is hereby awarded injunctive relief of removal of his SOTN score until provided with a hearing to contest that classification.  Defendants are granted summary judgment

on the remainder of Plaintiff's claims.[9]  The Clerk may close the file.

       SO ORDERED.

       Dated at New Haven, Connecticut, this  21st  day of August, 2008.


                                             /s/
                                Peter C. Dorsey, U.S. District Judge
                                United States District Court

---

[9]    Defendants are granted summary judgment on Plaintiff's substantive due process and equal protection claims, which were not briefed by either party but for which Defendants are also entitled to government immunity.